**NEAL AND COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 57–85C.**

United States Claims Court.

Sept. 17, 1987.

R.R. DeYoung, Anchorage, Alaska, for plaintiff.

Ronald A. Schechter, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, Director, and M. Susan Burnett, Asst. Director, Washington, D.C., for defendant. Michael T. Paul, Washington, D.C., argued for defendant. David Brochstein, U.S. Coast Guard, Washington, D.C., of counsel.

## OPINION

SMITH, Chief Judge.

This case is before the court on Defendant's Motion for Summary Judgment. The court grants defendant's motion because there are no genuine issues of material fact and the United States is entitled to judgment as a matter of law. This opinion follows an oral ruling given to the parties on March 26, 1987. The Claims Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1491 (1982), and the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982).

### Facts

This case arises out of a contract between Neal and Company, Inc., (Neal) and

the United States Coast Guard (Coast Guard). The subject contract was awarded on March 30, 1982, for the renovation of housing units in Kodiak, Alaska. This contract was known as the Phase III contract; all three phases of the overall project concerned the renovation of family housing units for the Nemtz Park/Lake Louise area. Neal was the successful low bidder for both the Phase II contract, which was awarded to plaintiff on July 31, 1981, and the Phase III contract which was awarded on March 30, 1982. Subsequently, plaintiff filed two claims for equitable adjustments with the contracting officer, both of which were denied. Because of the interrelation of the facts in these two contracts and the legal impact of the denial of the Phase II contract claim upon the Phase III contract claim, the court must devote some attention to the facts of the Phase II contract claim even though it is the Phase III contract claim which is the subject of the instant action.

### The Phase II Contract

On July 31, 1981, the Coast Guard awarded Neal the Phase II contract. Contract DTCG35–81–C–00079 was a firm fixed price contract in the amount of $895,-200.00. Pursuant to the terms of the contract, Neal was obligated to perform the total rehabilitation of twenty-six housing units at the Nemetz Park Family Housing Complex, Coast Guard Support Center, Kodiak, Alaska. The work involved, among other things, replacing the exterior siding and renovating the interiors of certain buildings. That contract, at General Provision 5, "Termination for Damages for Delay—Time Extensions," paragraph (a), provides in pertinent part:

If the Contractor ... fails to complete said work within such time [specified in this contract], the Government may, by written notice to the Contractor, terminate his right to proceed with the work ... Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties shall be liable for any damage to the Government resulting from his refusal or failure to complete the work within the specified time.

Furthermore, paragraph (d) of this General Provision provides:

The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if: (1) The delay in the completion of work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor including but not restricted to, acts of God ... unusually severe weather, or delays of subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers....

Therefore, in the absence of any provision for liquidated damages under the contract, Neal would be rendered liable for any actual damages it or the Coast Guard sustained as a result of its failure to perform its obligations under the contract within the period specified or within any time modifications agreed to by the parties. Although the original completion date of the Phase II contract was June 13, 1982, that date was subsequently extended to August 9, 1982, by a series of contract modifications.

The contract modifications[1] which extended the completion date were as follows:

| Modification | Execution Date | New Completion Date |
|---|---|---|
| 4 | July 13, 1982 | July 11, 1982 |
| 5 | July 13, 1982 | July 27, 1982 |
| 9 | July 13, 1982 | August 1, 1982 |
| 11 | November 30, 1982 | August 4, 1982 |
| 12 | December 15, 1982 | August 8, 1982 |
| 14 | December 17, 1982 | August 9, 1982 |

During the course of the Phase II contract, Neal's painting subcontractor failed to meet the necessary deadlines and Neal's performance was delayed beyond the required completion date, August 9, 1982. Also during this period, the Coast Guard awarded the Phase III contract work at Nemetz Park to Neal, as the low bidder on March 30, 1982. On July 21, 1982, a preconstruction conference for the Phase III

---

1. Apparently, the majority of the modifications were retroactive extensions.

contract was held. After that conference, the status of the Phase II project was discussed and Neal was informed that the Phase II buildings were needed to house the families then occupying the Phase III buildings. Neal was also notified that the work on the Phase III contract could not begin until some or all of the Phase II buildings were completed.

On September 2, 1982[2], Neal formally notified the Coast Guard that it had not been allowed to start the Phase III work and that it would seek both a contract extension and an equitable adjustment to recover its additional costs. By letter dated September 8, 1982, the contracting officer responded that he believed that at the July 21st meeting, the parties had agreed to a one-for-one swap of the Phase II and III buildings and that Neal would be responsible for any additional costs associated with its failure to complete the Phase II buildings in a timely fashion.

The Phase II buildings, which were to be finished by August 9, 1982, were actually completed as follows:

| Building | Completion Date |
|---|---|
| 723 | September 15, 1982 |
| 721 | September 22, 1982 |
| 720 | October 8, 1982 |
| 724 | October 13, 1982 |
| 722 | November 2, 1982 |

On March 2, 1983, Neal submitted a certified claim to the contracting officer for additional costs incurred in the Phase II contract. After denial of its Phase II claim by the contracting officer, Neal filed an appeal with the Department of Transportation Contract Appeals Board (DOTCAB or Board) alleging that the company was entitled to an equitable adjustment of $85,764. On November 13, 1984, the DOTCAB denied plaintiff's Phase II claim in its entirety. Subsequently, the Court of Appeals for the Federal Circuit affirmed the judgment of the Board. *Neal & Company, Inc.*, 85–1 BCA (CCH) ¶ 17,794 (1984), *aff'd*, 785 F.2d 324, (Fed.Cir.1985). The DOTCAB ruled that Neal was fully responsible for the delays in completing the Phase II work and that the extra costs incurred due to the delay in availability of the Phase II housing were sufficiently foreseeable to hold Neal liable for the additional amounts.

### The Phase III Contract

As noted earlier, the Phase III follow-on contract, number DTCG35–82–C–0060, with a price of $1,233,746.00, was awarded to Neal on March 30, 1982. As a result of the defendant's refusal to grant additional time extensions, Neal allegedly was forced to accelerate its work on the Phase III project in order to complete it within the time provided by the contract. This caused Neal to incur additional costs in the amount of $166,738.00.[3] Plaintiff also contends that due to defendant's refusal to grant a time extension, Neal was forced to perform the renovation work on the Phase III project in very inclement winter weather which also forced the acceleration of its performance.

Neal filed a certified claim for an equitable adjustment of the Phase III contract on April 10, 1984, which was denied September 27, 1984, by the contracting officer. The primary reason cited by the contracting officer for denying Neal's claim in its entirety, was Neal's failure to complete the Phase II work on time. The adverse final decision also noted that if the Phase II buildings had been finished by the August 9th deadline, and if the Coast Guard had taken the same amount of time to move the families from the Phase III to the Phase II buildings as it actually did once Neal completed Phase II; then two of the five buildings would have been given to Neal either on time or earlier. One of the buildings would have been only three days late; one would have been five days late; and the last of the five buildings would have been turned over only thirteen days late. Neal, on the other hand, was thirty-six days late

---

2. The work under the Phase III contract was to begin September 1, 1982.

3. Neal's claim to the contracting officer and its complaint filed in this court states its claim is in the amount of $154,393.00. However, in footnote 1 of Plaintiff's Opposition to Defendant's Motion for Summary Judgment it states that "there is a mathematical error in the claim's pricing sheet, which was recognized by the Contracting Officer and Neal's correct claims is $166,738.00. Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 2 n. 1.

in completing the first building; forty-four days late with the second; sixty days late with the third; sixty-five days late with the fourth; and eighty-five days late completing the final building. Thus, Neal's delay in completing the contract cannot be attributed wholly or even in significant part to the late building turnover by the defendant. Subsequently, Neal filed its complaint in this court on January 28, 1985.

## Discussion

The question which defendant's motion presents is whether Neal's failure to complete the Phase II contract in a timely fashion was the direct cause of its delay in beginning the Phase III contract. This requires us to deal with the question of whether the findings of the DOTCAB, and its affirmance by the Court of Appeals for the Federal Circuit, bar plaintiff's recovery. It also requires the court to decide whether Neal is barred from recovery here, if it was the cause of the Phase II delays.

## Claim and Issue Preclusion

█ The well-settled principles of claim and issue preclusion provide that when a tribunal of competent jurisdiction has rendered a final judgment on the merits of a case, that judgment operates as an absolute bar to the relitigation of the claim. *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567 (Fed.Cir.1984); *Stone v. United States*, 4 Cl.Ct. 264, 268 (1984). This doctrine applies with the same force to the decision of an administrative body such as the DOTCAB. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 334–35, 99 S.Ct. 645, 653–54, 58 L.Ed.2d 552 (1979).

█ In rejecting Neal's claim, the Board made numerous determinations in four areas of primary concern; (1) government-directed changes; (2) weather; (3) adequacy of staffing and supervision; and (4) change to the order of work. In order to determine whether the preclusive effect of these findings bars plaintiff's recovery in the instant case, this court must examine those findings.

## 1. Government-Directed Changes

Specifically, the DOTCAB found under the *"Government directed changes"* section that:

[Neal] ... did agree to certain time extensions after opportunity for negotiation and it did execute contract modifications which specially recited that they were intended to be a complete resolution of all claims for equitable adjustment which would arise out of those changes. (Finding 7). In executing the time extension modifications [Neal] must have realized that several gave less additional time than it had initially proposed. Nevertheless, it did not seek to reserve a claim for cumulative impact. . . .

. . . .

In the instant case, not only was there no reservation of rights, but the parties in fact executed contract modifications embodying an explicit release of further claims. The cumulative impact effect upon appellant's operation in general and upon the subcontractor's operations in particular was foreseeable. Many of the changes occurred early in the work, and appellant knew by the time it executed the modifications which extended time (cf. Finding 1) that Ideal [Neal's subcontractor] commenced work in April rather than in January as had been planned. By the time the modifications were presented for formal execution, appellant must have known of the cumulative impact now alleged. (Findings 1, 7). It could have refused to execute the modifications with the release of claims provision (set out in Finding 7) or without a reservation of rights to pursue an impact claim. It did not do either. Later recovery is therefore precluded. (Citations omitted).

*Neal and Company, Inc.*, 85–1 BCA at 88,946.

Thus, Neal was fully responsible for any delay as a result of these changes.

## 2. Weather

With regard to the delay which was allegedly due to the severe weather conditions, the Board ruled that:

Appellant's letter of June 30 (see Finding 21) did state that "The rain has al-

ready caused us two weeks of delay ..." After June 30, 19 additional days elapsed before, according to the climatological data and our Findings 12 and 13, exterior painting could be performed. This would have totalled 33 days of delay, if in fact appellant could have performed no work during this period and did none. But the record is clear that, when the rains came, (i) appellant's painting operation was far behind the schedule established by the contract as amended by the change order modifications, and (ii) the foreman's diary (AF, Tabs 152–231), the CQC reports (Finding 19), the weekly Contracting Officer's Representative reports (Finding 20), and the progress payment requests (Finding 17) show that painting continued fairly regularly throughout the raining period inside of the buildings. In fact, interior painting continued long after the exterior painting had been completed in late July.

*Id.* at 88,947.

This section of the Board's opinion shows that plaintiff, not weather, was responsible for the delay.

### 3. Adequacy of Staffing and Supervision

The Board also found that Neal failed to adequately staff the job and supervise its employees.

It is clear from the record ... that whenever weather was suitable for exterior painting, the subcontractor would siphon off painters to work on another contract it held because it lacked the manpower to staff both jobs. (Findings 5, 9). The diary entries and the hearing testimony in its entirety convinced us not only the Ideal failed to adequately staff the project and exercise effective supervision over its employees to assure that they performed in an orderly, efficient manner, producing quality workmanship. This we have found as fact. (Findings 5, 9, 35–39).

*Id.* at 88,497.

### 4. Change to the Order of Work

Finally, with respect to the change to the order of work, the DOTCAB was not per-suaded by plaintiff's allegation that the Contracting Officer's direction that Phase III buildings would be withheld from appellant under the follow-on contract and released on a one-for-one basis as Phase II buildings were completed, constituted a change to the contract. The Board based its ruling on its finding that:

At the hearing, appellant's personnel testified that, were it not for the effect of this directive that efforts were to be concentrated in one unit at a time, its workers would have proceeded, assembly-line fashion, through the units and completed the entire project more quickly. (Finding 41). However, since almost the entirety of the remaining work was painting work to be performed by Ideal (Findings 33–34), it is difficult to understand how this directive would have extended performance period. Surely, the painting subcontractor would have worked on one unit at a time, or if it had a larger crew on several units at a time, but it is doubtful that the painting crew would have been kept moving through all of the buildings to keep them at an even stage of completion. Such an approach patently would have been far less efficient than finishing one unit at a time, due to the time necessarily wasted in demobilizing the crew at one site, remobilizing it at another, and reorganizing and redirecting the work crews.

*Id.* at 88,948.

The court must conclude that based upon these findings and the doctrines of claim and issue preclusion, plaintiff is barred from relitigating those issues upon which its claim hinges. There is no evidence before this court that the damages incurred in the Phase III contract were caused by anything other than plaintiff's delay in completing the Phase II contract buildings. If the Phase II contractor had not been the plaintiff Neal, then the outcome would be different. The Phase III contractor would be compensated for its damages by the government and then the government would sue the Phase II contractor for its damages. Here, it is unnecessary to take

those steps since the plaintiff is the cause of its own loss.

 Put another way, the defendant is entitled to an offset against Neal for any of Neal's additional costs in connection with the Phase III contract since those costs are part of the defendant's actual damages under the Phase II contract. It would indeed be an anomalous result to allow a contractor to recover damages which he himself caused. In effect, the court would be rewarding the contractor for breaching an earlier contract. This cannot and should not be done.

Although plaintiff is *correct* that it is *not seeking* to relitigate the identical claim in the instant case that it litigated before the Board, this fact does not save plaintiff's position. While not litigating the same claim, plaintiff seeks to litigate the same underlying facts. Under established principles of issue preclusion, plaintiff is barred from doing this.

The real issue resolved by the Board's decision is the source of the delay which caused damages in both contracts, and the Board ruled, and the Federal Circuit affirmed, that that delay was caused by the plaintiff. Even though the delay came from another contract it cannot be ignored that the instant plaintiff was the cause of that earlier contract's delay. It would be a waste of judicial and party resources to relitigate liability and damage issues for the Phase III buildings. Plaintiff has been unable to point to any facts which support its allegation that it is entitled to an equitable adjustment under the follow-on contract.

## Conclusion

Based upon the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

The clerk is directed to dismiss the complaint.

No Costs.